IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MONARCH NUTRITIONAL LABORATORIES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br><br>MAXIMUM HUMAN PERFORMANCE, INC.,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:03-CV-474 TC |

In this UCC Article 2 (Sales) case,[1] Plaintiff Monarch Nutritional Laboratories, Inc.

("Monarch"), a manufacturer of the nutritional supplement called Trac Formula ("TRAC"),

brought a breach of contract action against one of its customers, Maximum Human Performance,

Inc. ("MHP"), for alleged failure to pay for two separate orders of TRAC.[2]  MHP filed a

counterclaim against Monarch based on a third order, alleging that Monarch provided a defective

product to MHP which had to be recalled and caused hundreds of thousands of dollars in damage

to MHP.[3]

---

[1]The court has diversity jurisdiction.

[2]Monarch asserts three causes of action: (1) breach of contract, (2) breach of the implied
covenant of good faith and fair dealing, and (3) unjust enrichment.

[3]MHP's Counterclaim asserts six causes of action: (1) breach of warranty (warranty of
fitness for a particular purpose and warranty of merchantability), (2) breach of contract,
(3) breach of the implied covenant of good faith and fair dealing, (4) enforcement of settlement
agreement, (5) revocation of acceptance, and (6) unjust enrichment.  Whether the product was

This matter is before the court on the parties' cross motions for partial summary judgment.  Also before the court is Monarch's Motion To Strike MHP's Additional Motion For Partial Summary Judgment.

The threshold issue before the court is whether Monarch's Terms & Conditions sheet is a valid and enforceable part of the contract between Monarch and MHP for three separate sales transactions.  For the reasons set forth below, the court finds that the Terms & Conditions sheet is a valid and enforceable part of the contract and so Monarch is entitled to partial summary judgment.

## BACKGROUND[4]

Plaintiff Monarch is a merchant in the dietary supplement business.  Monarch's primary business involves the manufacture and sale of dietary supplements to distributors in the industry.  Monarch manufactures TRAC, a time-release creatine[5] nutritional supplement powder (apparently the powder, which is flavored – e.g., grape or lemon, is dissolved in water before being ingested).

Defendant MHP is also a merchant in the dietary supplement business.  MHP's primary business involves the purchase of dietary supplements, such as TRAC, from manufacturers like Monarch and the sale of such supplements to retailers such as GNC.

In May 2000, Monarch and MHP entered into a business relationship for the purchase and

_____

defective is not at issue in this set of motions before the court.

[4]The material facts relevant to the court's holding are not in dispute.

[5]"Creatine" is an amino acid derivative that has been known to enhance strength and build muscle.  See www.stanford.edu/group/hopes/sttools/gloss/c.html.

2

sale of TRAC that lasted approximately 2 ½ years.  The dispute currently before the court arose

out of three separate transactions that occurred between the parties during that two-and-a-half

year time period:

    (1)    Purchase Order No. 352 (submitted by MHP to Monarch on August 2, 2001) (this

        is the subject of MHP's Counterclaim);

    (2)    Purchase Order No. 619 (submitted by MHP to Monarch on June 19, 2002) (this

        is the subject of Monarch's Complaint); and

    (3)    Purchase Order No. 645 (submitted by MHP to Monarch on July 11, 2002) (this is

        the subject of Monarch's Complaint).

### Summary of Parties' Arguments

Monarch asserts that MHP did not pay invoices for two orders of TRAC (ordered through

Purchase Orders Nos. 619 and 645 and shipped in the summer of 2002).  Monarch claims as

damages the balance owed on the two invoices, and 18% annual interest on the outstanding

balances.  Monarch bases its damages claims on terms contained in Monarch's "Terms &

Conditions of Sale" that it sent to MHP, which it contends is part of the contract between

Monarch and MHP based on UCC law and the parties' course of dealing and performance.  MHP

denies that the contract includes the Terms & Conditions and argues that the law does not allow

Monarch to recover interest.

MHP filed a counterclaim, alleging that Monarch sent MHP a latently defective batch of

TRAC in August 2001 (which MHP ordered through Purchase Order 352 ("PO 352") on August

2, 2001).  MHP claims that the TRAC shipped pursuant to PO 352 (Lot No. 1908152) had a

rancid taste that was not detectable until customers who purchased TRAC from the retail stores

began complaining to MHP.  MHP recalled all of Lot No. 1908152, sent out refunds to customers, and now seeks consequential damages from Monarch through breach of warranty and other contract claims.  Monarch asserts that the Terms & Conditions disclaims the warranties MHP is attempting to rely on, precludes recovery of consequential damages, and limits MHP's damages to MHP's cost for the TRAC.  In opposition, MHP contends that the Terms & Conditions does not apply at all to its contractual relationship with Monarch because Monarch's unilateral sending of the Terms & Conditions after the contract had already been formed had no legal effect.  According to MHP, the contract that was formed contained no additional terms and so the gap filling provisions of the UCC (such as provision for warranty) and common law govern the agreement between the parties.

**The Parties' Correspondence**

Between May 2000 and August 2002, MHP placed eleven purchase orders with Monarch for the manufacture and sale of TRAC, none of which contained any terms other than MHP's standard price, quantity, flavor, bottle-type and shipping terms printed on the face of each purchase order.  The TRAC ordered through purchase orders was usually delivered in more than one shipment.

With the exception of the first two purchase orders, Monarch responded, after receiving a purchase order placed by MHP, with several documents, including an Order Verification (this did not contain the Terms & Conditions), packing slips, and invoices.  It was Monarch's routine practice to enclose its "Terms & Conditions of Sale" sheet in the same envelope as each invoice that Monarch sent to MHP.  The invoice and Terms & Conditions were mailed a day or two after each batch of TRAC was shipped.  Monarch mailed approximately forty-three invoices to MHP

4

over the course of the parties' relationship.  Before MHP placed PO 352, it had received at least

twelve copies of the Terms & Conditions in the packing papers or with the invoice.  For PO 352,

Monarch sent and MHP received at least four copies of the Terms & Conditions in the packing

papers or with the invoice.  During the remainder of the parties' relationship (i.e., after PO 352

and before this lawsuit), Monarch sent and MHP received at least thirteen copies of the Terms &

Conditions in the packing papers or with the invoices for other orders.  (See Ex. 1 attached to

Aff. of Kristopher S. Kaufman (Docket No. 66) (summarizing number of documents exchanged

between the parties during their business relationship).)  Apparently, MHP paid at least twenty-

four invoices that were accompanied by the Terms & Conditions, including at least four of the

invoices for PO 352.  MHP did not object to the Terms & Conditions until this dispute arose.

### Monarch's Terms & Conditions of Sale

Monarch's Terms & Conditions sheet includes the following relevant provisions:

> **Payment.**  Terms of Payment . . . net 30 days from date of shipment. . . .
> Any amounts owing hereunder and not paid on a timely basis shall bear
> interest at a rate of 1 ½ % per month, which is an annual percentage rate of
> 18% per annum. . . .

> **Warranty and Disclaimer**. . . . CUSTOMER HEREBY DISCLAIMS
> ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, REGARDING
> THE ARTICLES, THEIR FITNESS FOR ANY PURPOSE, THE
> QUALITY, OR THEIR MERCHANTABILITY.  IN NO EVENT SHALL
> SELLER BE LIABLE FOR ANY LOST PROFITS OR OTHER
> CONSEQUENTIAL OR INCIDENTAL DAMAGES FOR THE COST
> OF PROCUREMENT FROM THIRD PARTIES OF ANY SUBSTITUTE
> GOODS, WHETHER AS A RESULT OF ALLEGED OR ACTUAL
> BREACH OF CONTRACT, NEGLIGENCE OR OTHERWISE, AND
> WHETHER OR NOT SELLER HAS BEEN ADVISED OF THE
> POSSIBILITY OF SUCH. [emphasis in original]

(Terms & Conditions of Sale, attached as Ex. 1 to Pl.'s Complaint, at ¶¶ 2, 7 (underline emphasis

5

added).)

### Purchase Order 352 (August 2, 2001)

On August 2, 2001, MHP placed Purchase Order No. 352 ("PO 352") with Monarch.

MHP claims that the product sent pursuant to PO 352 was grouped into three batches under one

lot number.  MHP, upon receiving complaints from purchasers who actually used this product,

recalled the entire lot and notified Monarch of the defective batch.

### Purchase Order No. 619 (June 19, 2002)

On June 19, 2002, MHP sent Monarch a Purchase Order No. 619 ("PO 619").  Monarch

then sent three separate written Order Verifications (June 20, 2002, June 24, 2002, and June 25,

2002) stating the quantities and price of the Trac Formula to be shipped (in three separate

shipments) to MHP pursuant to the purchase order.  The Terms & Conditions was not sent with

the Order Verifications.  Monarch shipped the entire order to MHP that summer of 2002.

Monarch then followed up each shipment with an invoice.  Monarch asserts that a copy of the

Terms & Conditions sheet was included with each invoice.  MHP did not pay the invoices.

### Purchase Order No. 645 (July 11, 2002)

On July 11, 2002, MHP sent Monarch a Purchase Order No. 645.  Monarch then sent a

written Order Verifications (dated July 12, 2002) stating the quantities and price of the Trac

Formula to be shipped to MHP pursuant to the purchase order.  Monarch shipped the entire order

to MHP that summer of 2002.  Monarch followed up each shipment with an invoice.  Monarch

asserts that included with each invoice was a copy of the Terms & Conditions sheet.  MHP did

not pay the invoices.[6]

## ANALYSIS

The overall issue is whether the Terms & Conditions govern the three transactions at issue. More specifically, the questions are (a) whether the Terms & Conditions are part of the contract because a "definite and seasonable expression of acceptance or a written confirmation" was sent to MHP by Monarch "within a reasonable time" and did not materially alter the contract, pursuant to Utah Code Ann. § 70A-2-207(1) & (2) ("Additional terms in acceptance or confirmation"); or, in the alternative, (b) whether the Terms & Conditions are part of the contract through the parties' course of dealing, pursuant to Utah Code Ann. §§ 70A-2-205, 70A-2-208.

Because the court finds that the Terms & Conditions sheet was a valid and enforceable part of the contract between the Plaintiff and Defendant – based on a finding of a "definite and seasonable expression of acceptance or a written confirmation" sent by Monarch to MHP "within a reasonable time" without material alteration of the contract, pursuant to UCC § 2-207 – the court does not reach the alternative basis upon which Monarch relies (i.e., course of dealing and performance under UCC §§ 2-205 and 2-208).

### Uniform Commercial Code Section 207 – "Battle of the Forms" Provision

Monarch contends that the Terms & Conditions sheet is part of the contract between it and MHP based on the language of Uniform Commercial Code ("UCC") Section 2-207 (commonly known as the "Battle of the Forms" provision). That section is codified in Utah code

---

[6]It appears that MHP refused to pay the invoices for Purchase Orders Nos. 619 and 645 because it believed it was entitled to off-set the amount of damages it allegedly incurred in connection with a recall of TRAC product purchased through its earlier Purchase Order No. 352. (See Monarch's Mem. in Supp. at vii n.5.)

at § 70A-2-207, which provides, in relevant part, that:

> A definite and seasonable expression of acceptance or <u>a written confirmation</u> which is <u>sent within a reasonable time</u> <u>operates as an acceptance even though it states terms additional to or different from those offered or agreed upon</u>, unless acceptance is expressly made conditional on assent to the additional or different terms.

Utah Code Ann. § 70A-2-207(1) (emphasis added).   The provision continues:

> The <u>additional terms</u> are to be construed as proposals for addition to the contract. [But between] merchants such terms become part of the contract unless:
>
>> (a) the offer expressly limits acceptance to the terms of the offer;
>>
>> (b) <u>they materially alter it</u>; or
>>
>> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Utah Code Ann. § 70A-2-207(2) (emphasis added).   There is no question that Monarch and MHP are merchants and that the three transactions at issue were transactions "between merchants." <u>See</u> Utah Code Ann. §§ 70A-2-104(1), -104(3).[7]

### Were the Terms & Conditions Part of a Written Confirmation?

The first issue is whether Monarch's practice of sending the Terms & Conditions with invoices to MHP created a "written confirmation" sent within a reasonable time of MHP's purchase orders, as required by UCC § 2-207.  MHP argues that Monarch's Order Verification,

---

[7]"Merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge and skill." § 70A-2-104(1).  "Between merchants" is defined as "any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants." § 70A-2-104(3).

which was faxed to MHP after receipt of the purchase order and which did not contain the Terms & Conditions, was the written confirmation.  It follows, MHP asserts, that because the Order Verification did not contain any additional terms, the agreement was finalized and anything submitted by Monarch (e.g., the Terms & Conditions connected to the invoices and packing slips) was null and void because there was no express agreement by MHP accepting the Terms & Conditions.  In other words, at the point Monarch faxed the Order Verification, the agreement was final and could not be amended by Monarch's unilateral act of inserting the Terms & Conditions in the invoice envelope.  The court disagrees with MHP's argument.

UCC language, UCC official commentary, and case law support the proposition that an intervening correspondence such as the Order Verification establishing an informal agreement does not preclude addition of terms to the agreement between merchants.  For example, the Official Comment to Section 2-207 states that "[t]his section is intended to deal with two typical situations.  The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed."  UCC § 2-207 cmt. 1 (emphasis added); see also Utah Code Ann. § 70A-2-207(1) ("[A] written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon") (emphasis added).  In Waukesha Foundry, Inc. v. Industrial Eng'g, Inc., 91 F.3d 1002 (7th Cir. 1996), the court held that the issue of whether the seller sent an acknowledgment form confirming the buyer's order was immaterial to the court's analysis under UCC Section 2-207.  "There is no need to identify at precisely what point in time each contract of sale between [the buyer and

seller] came into being, for the course of conduct by both parties demonstrates the existence of a series of contracts for the sale of castings. . . . The . . . question is: What terms were part of these contracts?" Id. at 1007.

Here, there is no dispute that a contract was formed. "Once a contract of sale is established, UCC § 2-207 determines whether additional terms are made a part of that contract." Id. See also Step-Saver Data Sys., Inc. v. Wyse Tech., 939 F.2d 91, 98 (3d Cir. 1991) ("We see no need to parse the parties's various actions to decide exactly when the parties formed a contract. [The seller] has shipped the product, and [the buyer] has accepted and paid for [the product]. The parties's performance demonstrates the existence of a contract. The dispute is, therefore, not over the existence of a contract, but the nature of its terms."); Mid-South Packers, Inc. v. Shoney's, Inc., 761 F.2d 1117, 1123 (5th Cir. 1985) ("Section [2-207 of the UCC] applies to the situation in which an agreement has been previously reached either orally or by informal writings, and one or both parties send written confirmation of terms discussed, adding certain terms not discussed.") (emphasis added). Despite Monarch's transmittal of the Order Verification before sending the Terms & Conditions to MHP, the court finds that the Terms & Conditions, sent either with invoices or packing slips, was part of a written confirmation under Utah Code Ann. § 70A-2-207.[8]

Moreover, the invoices containing the Terms & Conditions constituted a written confirmation sent within a reasonable time of MHP's purchase orders. See Transamerica Oil

---

[8]It is undisputed that, for the purchase orders at issue, MHP received the Terms & Conditions either along with Monarch's packaging documents or shortly thereafter along with Monarch's corresponding invoices.

Corp. v. Lynes, Inc., 723 F.2d 758, 765 (10th Cir. 1983) ("The invoice sent with the goods would

surely qualify as an acceptance or written confirmation. Thus, the provisions in the invoice are

relevant in defining the contract.") (internal citations omitted).

Because the contract for sale of TRAC was between merchants, the court must find that

the additional terms contained in the Terms & Conditions – the 18% interest rate,[9] the limitation

of consequential damages, and limitation of warranties – are part of the agreement between MHP

and Monarch unless they materially alter it.  See Utah Code Ann. § 70A-2-207(2) ("Between

merchants such [additional] terms become part of the contract unless . . . they materially alter

it").[10]

### Did Monarch's Additional Terms Materially Alter the Contract?

An additional term materially alters the contract if it "results in surprise or hardship if

incorporated without the express awareness by the other party."  American Ins. Co. v. El Paso

Pipe & Supply Co., 978 F.2d 1185, 1189 (10th Cir. 1992) (quoting Official Comment 4 to UCC

2-207) (emphasis added).

"[A]wareness [as the term is used in comment 4 to UCC § 2-207] does not

---

[9]The Terms & Conditions also contains a provision allowing for collection of attorneys'
fees and costs.  Although Monarch seeks attorneys' fees and costs in its Complaint, the parties'
briefs do not address whether the attorneys' fees provision is a material alteration of the
agreement.  Accordingly, the court does not reach that issue.

[10]It is undisputed that the purchase orders did not expressly limit acceptance to their terms
and that MHP did not object to any of the Terms & Conditions throughout the parties's
relationship.  Accordingly, sections 70A-2-207(2)(a) & -207(2)(c) are not applicable to the
court's analysis.  See also JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47, 57-59 (1st Cir. 1999)
(holding that a "silent buyer" – a buyer whose "purchase order includes no term relating to the
subject matter dealt with in the new term proposed by the seller" – may only withstand
incorporation of the seller's additional terms by establishing that the additional terms are a
material alteration).

11

necessarily require a party actually to have read the additional term." Therefore, on the issue of <u>surprise</u> there is <u>both a subjective and an objective element to the inquiry</u>. Courts should first make factual findings as to whether a nonassenting party subjectively knew of an added term. It must then make findings of fact concerning whether that party should have known that such a term would be included.

<u>Id.</u> at 1191 (internal citations omitted). The question of materiality must be determined "in light of the facts of the case and the parties' expectations." <u>Transamerica Oil Corp. v. Lynes, Inc.</u>, 723 F.2d 758, 765 (10th Cir. 1983).

MHP bears the burden of proving surprise or hardship. <u>Id.</u> at 1192 n.9. "A profession of surprise and raised eyebrows are not enough. . . . To carry the burden of showing surprise, a party must establish that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term." <u>Bayway Refining Co. v. Oxygenated Mktg. & Trading A.G.</u>, 215 F.3d 219, 224 (2d Cir. 2000). With respect to hardship, "[t]ypically, courts that have relied on hardship to find that an additional term materially alters a contract have done so when the term is one that creates or allocates an open-ended and prolonged liability." <u>Id.</u> at 226. Factors to evaluate include the parties' prior course of dealing, the number of written confirmations exchanged between the parties, industry custom, and whether the provision was clearly marked. <u>See</u> <u>American Ins. Co.</u>, 978 F.2d at 1191.

### *Interest Provision*

The interest provision of the Terms & Conditions provides:

> **Payment.** Terms of Payment . . . net 30 days from date of shipment. . . . Any amounts owing hereunder and not paid on a timely basis shall bear <u>interest at a rate of 1 ½ % per month, which is an annual percentage rate of 18% per annum</u>. . . .

(Terms & Conditions ¶ 2 (emphasis added).) "In evaluating what constitutes a material alteration

[courts look] to the Official Comments to UCC 2-207 for guidance."  American Ins. Co. v. El

Paso Pipe & Supply Co., 978 F.2d 1185, 1189 (10th Cir. 1992).  See also Scharf v. BMG Corp.,

700 P.2d 1068, 1070 (Utah 1985) (stating that when Utah commercial code provision is identical

to its UCC counterpart, "[i]n interpreting provisions of [the Utah] Code, [Utah courts] often turn

to the official comments of the Uniform Commercial Code for guidance.").  The Tenth Circuit

has noted that Comment 5 to UCC § 2-207 provides "examples of clauses which involve no

element of unreasonable surprise and which therefore are to be incorporated in the contract

unless notice of objection is seasonably given . . . . [Those examples include] a clause providing

for interest on overdue invoices. . . ."  American Ins. Co., 978 F.2d at 1189 (quoting UCC § 2-

207 cmt. 5).  The Tenth Circuit also said

> [w]e can readily understand why the [court in Offen, Inc. v. Rocky Mountain
> Constructors, 765 P.2d 600 (Colo. Ct. App. 1988)] would find that the provision
> allowing for interest on overdue invoices became a part of the agreement.  It is
> precisely one of the examples of clauses that do not constitute material alterations
> listed in Comment 5.  In addition, "it is common in commercial circles, including
> transactions with non-merchants, for balances to be subjected to interest charges."

Id. at 1190 (internal citations omitted).

MHP asserts that "[w]ith respect to the 18% interest clause, a careful reading of [Johnson

Tire Serv., Inc. v. Thorn, Inc., 613 P.2d 521 (Utah 1980)] indicates that the Utah Supreme Court

would find such a term material."  (MHP Opp'n Mem. at 17.)  According to MHP's

interpretation of the Johnson case, "the [Johnson] court analyzed the parties' course of dealing in

actually paying the 18% interest over time thus indicating that interest at a rate of 18% was

material.  Without actual payments, the award of interest would not have been sustained.

Similarly, in the matter before this Court, where there is no history of interest payments, the 18%

13

interest rate clause should not be enforced."  (Id.)

The court disagrees.  Johnson is distinguishable on its facts.  For example, the buyer specifically objected to the interest rate set forth in invoices used by the plaintiff.  618 P.2d at 522.  The court noted that "inasmuch as there was never an acceptance of such terms as part of the agreement between the parties [during the parties' course of dealing], they were of no force and effect."  Id.  Moreover, the Johnson court does not address the language in Comment 5 of 2-207 regarding the examples of non-material alterations, which included interest clauses such as the one in this case.  Rather, that court analyzed the interest issue based on the parties' course of dealing and performance under UCC sections 2-205 and 2-208, which present different issues than the UCC section 2-207 analysis here.  See Johnson, 613 P.2d at 523-24.  MHP's reliance on Johnson for MHP's proposition that 18% interest is per se material is not persuasive.

Here, the court finds that the provision for interest on overdue invoices is not a material alteration.  Based on the record before the court, MHP did not object to the provision before litigation occurred.  Also, before MHP placed PO 352, it had received at least twelve copies of the Terms & Conditions in the packing papers or with the invoice.  Indeed, for PO 352, Monarch sent and MHP received at least four copies of the Terms & Conditions in the packing papers or with the invoice.  Finally, during the remainder of the parties' relationship (i.e., after PO 352 and before this lawsuit), Monarch sent and MHP received at least thirteen copies of the Terms & Conditions in the packing papers or with the invoices for other orders.  MHP has not met its burden of proving that the additional interest rate provision was a material alteration of the agreement between MHP and Monarch.  Accordingly,  Monarch's 18% interest provision is part of the parties's agreement for the purchase orders at issue.  See also American Ins. Co., 978 F.2d

14

at 1190 (noting that "'it is common in commercial circles, including transactions with non-merchants, for balances to be subjected to interest charges.'");  Advance Concrete Forms, Inc. v. McCann Constr. Specialties Co., 916 F.2d 412, 414-15 (7th Cir. 1990) (holding that 18% annual interest rate provision was not material alteration); Sudenga Indus., Inc. v. Fulton Performance Products, Inc., 894 F. Supp. 1235, 1238 (N.D. Iowa 1995) (holding additional term not material when invoices were issued "relatively contemporaneously with the shipment of goods," "the parties' dealings involved identical invoice provisions throughout the parties' relationship, a few additional terms are found in the invoices that are not in the purchase orders, and [the buyer] never exercised any opportunity to delete these additional terms");  Offen, Inc. v. Rocky Mountain Constructors, 765 P.2d 600 (Colo. Ct. App. 1988) (finding interest rate provision to be non-material alteration of agreement under UCC § 2-207);  Mid-State Contracting, Inc. v. Superior Floor Co., Inc., 655 N.W.2d 142 (Wisc. Ct. App. 2002) (same).

### Limitation of Damages Provision

The relevant section of the Terms & Conditions provides:

> **Warranty and Disclaimer**. . . .  IN NO EVENT SHALL SELLER BE LIABLE FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL OR INCIDENTAL DAMAGES FOR THE COST OF PROCUREMENT FROM THIRD PARTIES OF ANY SUBSTITUTE GOODS, WHETHER AS A RESULT OF ALLEGED OR ACTUAL BREACH OF CONTRACT, NEGLIGENCE OR OTHERWISE, AND WHETHER NOT SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH.

(Terms & Conditions ¶ 7 (emphasis in original).)  According to Official Commentary of UCC § 2-207, a clause "otherwise limiting remedy in a reasonable manner" involves no element of unreasonable surprise and so is not a material alteration of an agreement between merchants. See

15

70A-2-207 cmt. 5.  While Utah courts look to the official comment for guidance, the comment is not binding and the facts of the case must still be evaluated in light of cases interpreting the code provision.[11]

MHP relies on the following statement in <u>Transamerica</u> to support its position that the Monarch's remedy limitation provision is material: "A limitation of remedy generally constitutes a material alteration unless the buyer expressly agrees to the limitation."  723 F.2d 758, 765 (10th Cir. 1983) (internal citation omitted).  It appears that MHP interprets the statement "expressly agrees" too literally – that is, MHP apparently contends that there must be evidence of an express agreement such as a statement or writing expressly accepting the provision as part of the contract, rather than mere silence.  (<u>See</u> MHP's Opp'n Mem. at 15-17.)  The court concludes that the Tenth Circuit, especially in light of its citation to UCC 2-207 Comment 4 and its 1992 <u>American Insurance</u> decision, simply meant that a limitation of remedy is not a material alteration if the evidence of the parties' actions fairly infer that MHP was aware or should have been aware of the limitation.  To suggest otherwise is to suggest that UCC 2-207 is superfluous.  "UCC 2-207 'in essence supplies a presumption that the additional terms contained in confirmation forms are not read by the opposing party.'" <u>American Ins. Co.</u>, 978 F.2d at 1190 (internal citation omitted). The very nature of the situation addressed by UCC 2-207 suggests that there would never be an express agreement in the sense MHP interprets the phrase.

Given the fact that (1) the UCC allows a seller to limit the buyer's remedies to "return of the goods and repayment of the price or to repair and replacement of nonconforming goods or

---

[11]Given the lack of Utah law on the issue, the court looks to other jurisdictions which have enacted similar, if not identical provisions, of the UCC.

part,"[12] see Utah Code Ann. § 70A-2-719; (2) that MHP did not object to the provision despite

having received numerous copies of the Terms & Conditions before and during the completed

transactions relating to PO 352; and (3) that MHP requested and accepted reimbursement credits

in the amount of MHP's purchase price for allegedly damaged product under other purchase

orders, the court finds that the Monarch's limitation of consequential and incidental damages is

not a material alteration of the contract.  See, e.g., Waukesha Foundry, Inc., 91 F.3d 1002, 1008-

09 (7th Cir. 1996) (holding that limitation of consequential damages was not material alteration

of contract where transactions between parties belied the buyer's claim of unfair surprise); Suzy

Phillips Originals, Inc. v. Coville, Inc., 939 F. Supp. 1012, 1017-18 (E.D.N.Y. 1996) (finding

that limitation of liabilities clause was standard in trade practice and "it would be difficult for a

party to show surprise");  Kathenes v. Quick Chek Food Stores, 596 F. Supp. 713, 715-17

(D.N.J. 1984) (holding that similar remedy limitation was not material and noting that case

involved proper allocation of risk between merchants);  70A-2-207 cmt. 5 (reasonable limitation

of remedy is not material alteration of agreement).

     The key is that MHP bears the burden of showing surprise or hardship and that the

determination of materiality depends on the unique facts of the case.  The court finds that MHP

has not met its burden here.  The evidence in the record supports Monarch's position that MHP

knew or should have known of the remedy limitation, failed to object despite its knowledge, and

failed to demonstrate hardship.

     MHP also contends that Monarch's limitation of consequential damages is

---

[12]See also Utah Code Ann. § 70A-2-719(3) ("Consequential damages may be limited or
excluded unless the limitation or exclusion is unconscionable.").

unconscionable under Utah Code Ann. § 70A-2-719 and so is not enforceable.  According to

MHP, "[d]ue to the Terms and Conditions not being conspicuous, the damage limitation is

likewise unconscionable."  (MHP's Opp'n Mem. at 18.)  The court disagrees.

First, the UCC expressly recognizes that a seller may limit a buyer's remedies in the very

fashion used by Monarch.  See Utah Code Ann. § 70A-2-719.[13]  Second, the language in the

Terms & Conditions was in capital letters – hardly an inconspicuous writing.  The fact that the

Terms & Conditions was a separate sheet of paper not expressly incorporated by reference in the

invoice is of no consequence.  The fact remains that it was contemporaneously sent with the

invoices and/or packing papers and clearly related to the sale transaction.  Third, it is undisputed

that MHP received the Terms & Conditions multiple times and took advantage of the very same

remedy provision allowing for product replacement or reimbursement of purchase price.  Fourth,

the UCC sets forth a basic test to determine whether a portion of a contract is unconscionable,

and the circumstances in this case do not rise to the level contemplated by the Official UCC

Commentators:

> The basic test is whether, in the light of the general commercial background and
> the commercial needs of the particular trade or case, the clauses involved are so
> one-sided as to be unconscionable under the circumstances existing at the time of
> the contract . . . The principle is one of the prevention of oppression and unfair
> surprise and not of disturbance of allocation of risk because of superior bargaining
> power.

Utah Code Ann. § 70A-2-302 cmt. 1 (emphasis added).  See also Transamerica Oil Corp. v.

_____

[13]The UCC expressly allows a seller to limit a buyer's remedy to "return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts."  Utah Code Ann. § 70A-2-719(1)(a).  In the same code provision, it states that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."  Utah Code Ann. § 70A-2-719(3).

Lynes, Inc., 723 F.2d 758, 764 (10th Cir. 1983) (applying Kansas law, the court stated that it could not conclude "that a clause excluding a seller's liability for consequential commercial damages is unconscionable on its face.  It serves the commercially reasonably purpose of allocating unknown and undeterminable risks.").  In short, the court finds that Monarch's limitation of remedies clause was sufficiently conspicuous to be enforceable and is not unconscionable.  See also Schurtz v. BMW of N. Am., Inc., 814 P.2d 1108, 1114 (Utah 1991) ("[T]he trial court confronted with an issue of unconscionability . . . will generally find that provisions limiting incidental and consequential damages are . . . conscionable in commercial settings.").

### *Warranty Disclaimer*

The relevant section of the Terms & Conditions provides:

> **Warranty and Disclaimer**. . . . CUSTOMER HEREBY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE ARTICLES, THEIR FITNESS FOR ANY PURPOSE, THE QUALITY, OR THEIR MERCHANTABILITY.

(Terms & Conditions ¶ 7 (emphasis in original).)  The ultimate question is whether the additional term results in surprise or hardship under the particular facts of the case.  Again, MHP bears the burden on this issue.

For the same reasons relating to the parties' dealings and MHP's burden, the court finds that, in this case, the exclusion of warranties was not a material alteration of the contract.  See also, e.g., All-Iowa Contracting Co. v. Linear Dynamics, Inc., 296 F. Supp. 2d 969, 979 (N.D. Iowa 2003) (holding that in light of parties' dealings, and in spite of UCC 2-207 Official Comment 4, buyer could not "profess to be surprised" by the valid warranty disclaimer).

19

Moreover, the UCC allows a buyer to disclaim warranties if certain requirements are met. See Utah Code Ann. § 70A-2-316(2) (implied warranty disclaimer is valid if it is in writing, the language mentions merchantability, and the writing is conspicuous). The relevant section of the Terms & Conditions provides:

> **Warranty and Disclaimer**. . . . CUSTOMER HEREBY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE ARTICLES, THEIR FITNESS FOR ANY PURPOSE, THE QUALITY, OR THEIR MERCHANTABILITY.

(Terms & Conditions ¶ 7 (emphasis in original).) Here, the warranty disclaimer was in writing, was in capital letters, and specifically mentioned merchantability. It complies with § 70A-2-316. See also Utah Power & Light Co. v. Babcock & Wilcox Co., 795 F. Supp. 1074, 1076-77 (D. Utah 1992) (finding implied warranty disclaimer valid under Utah Code Ann. § 70A-2-316 because writing was in capital letters, was not ambiguous, and mentioned merchantability); Rawson v. Conover, 20 P.3d 876, 885-86 (Utah 2001) (holding that implied warranty disclaimer in capital letters that contained language very similar to the disclaimer language in the Terms & Conditions was valid under § 70A-2-316); Christopher v. Larson Ford Sales, Inc., 557 P.2d 1009, 1012 (Utah 1976) (a conspicuous disclaimer of implied warranty of merchantability is a writing that is "in larger or contrasting type or color"). Accordingly, the warranty disclaimer in Monarch's Terms & Conditions is enforceable.

## ORDER

1.  MHP's Motion for Partial Summary Judgment (Docket No. 51) is DENIED.

2.  Monarch's Cross Motion for Partial Summary Judgment (Docket No. 63) is GRANTED.

3.      MHP's Additional Motion for Partial Summary Judgment (Docket No. 74) is

DENIED.

4.      Monarch's Motion to Strike MHP's Additional Motion for Partial Summary

Judgment (Docket No. 85) is DENIED AS MOOT.

IT IS SO ORDERED this 18th day of July, 2005.

BY THE COURT:

TENA CAMPBELL
United States District Judge

21